USCA1 Opinion

 

 April 1, 1994 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1906 UNITED STATES, Appellee, v. FRANCISCO JAVIER PINEDA-PAZ, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. D. Brock Hornby, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Selya and Boudin, Circuit Judges. ______________ ____________________ Neal K. Stillman for appellant. ________________ Michael M. DuBose, Assistant United States Attorney, with whom __________________ Jay P. McCloskey, United States Attorney, was on brief for appellee. ________________ ____________________ ____________________ Per Curiam. A jury convicted the appellant, __________ Francisco Javier Pineda-Paz, of possessing cocaine base ("crack") with intent to distribute it. The evidence against him was strong. A coconspirator, Gonzalo Ceballos- Mejia (after pleading guilty) testified that, in early February 1993: 1) A drug dealer called Manuel met with Pineda, Ceballos, and Eduardo Gomez (who turned out to be a government informant) in Manuel's New Jersey apartment. With Pineda present, Manuel gave Ceballos a package of (about 100 grams of) crack, told him it was worth about $21,000, and said he would pay him $5,000 to take it to Maine. 2) On February 12, Pineda, Ceballos, and Gomez took the bus to Maine. Since the package of drugs was too big to fit into Ceballos's coat pocket, Pineda ended up carrying the package of drugs in his coat pocket for the first part of the trip. Pineda later gave Ceballos his (Pineda's) coat with the drugs, so that Ceballos would have the drugs with him when they got off the bus in Maine. 3) Upon their arrival in Maine, Pineda, Ceballos, and Gomez met another disguised government agent, DEA Agent Brady, who was pretending to be a drug buyer. All four drove off in a car. Agent Brady, asking questions through Gomez who acted as interpreter, established that Ceballos had the drugs and that the price was $21,000. Agent Brady then examined the cocaine. He left the car, ostensibly to obtain more money, at which time government agents arrested Pineda and Ceballos. Agent Brady corroborated many of these facts. Indeed, Pineda admitted most of them, including that he helped Ceballos carry a "package" to Maine. Pineda, however, did not admit that he was present when Manuel planned the drug transaction. And, he testified that the package was covered with aluminum foil and that he did not know, nor care to ask, about its contents. Rather, he said, he was simply a friend of Ceballos who had gone along with him to Maine, helping to carry the package, essentially for the ride. The jury did not believe Pineda's story, perhaps because of the unusual coat-switch; or because Pineda apparently showed no surprise, nor protested, during the drug sale in the car; or because Pineda admitted to law enforcement officials (after receiving Miranda warnings) that he had come to Maine "to _______ help sell the drugs" (though he later said he admitted this only because the officer "frightened" him and hurt him a "bit" when he "touch[ed]"/"hit" him on the leg). In any event, the jury convicted Pineda; and the court then imposed a sentence of 121 months. Pineda's arguments on appeal rather clearly lack merit and do not warrant lengthy discussion. First, he points out that Gomez, the government informer who accompanied him and Ceballos, lied before the grand jury. -3- 3 Indeed, the government concedes that Gomez falsely told the grand jury that Pineda had told him that he (Pineda) had previously been in the drug business and brought drugs to Maine. Pineda, however, does not argue that the government knew Gomez would testify falsely or that it acted improperly in any other way. And, the district court found that any error caused by the admission of this false testimony was harmless, see Bank of Nova Scotia v. United States, 487 U.S. ___ ___________________ _____________ 250, 256 (1988) ("customary harmless-error inquiry" applies to grand jury stage errors), for the grand jury had before it other evidence more than sufficient to warrant _____ indictment. See United States v. Maceo, 873 F.2d 1, 3 (1st ___ _____________ _____ Cir.) (district court finding of harmless error in respect to errors at the grand jury stage reviewed only for an abuse of discretion), cert. denied, 493 U.S. 840 (1989). We _____ ______ should also note the obvious, that since the perjured testimony was not introduced at trial, it did not affect the outcome of the trial. Second, Pineda complains that the district court improperly admitted hearsay evidence, namely, Pineda's affirmative nod (and related translations) in response to Agent Brady's question, translated by Gomez, whether Pineda had ever been to Maine before with Ceballos. Defendant says -4- 4 this evidence left the jury with the "false impression that he had been to Maine [before] to do drug deals" (emphasis _________________ added). The defendant did not object to the admission of the evidence at the time, however. And, it is, therefore, admissible whether or not it somehow rests upon hearsay. See United States v. Tabares, 951 F.2d 405, 409 (1st Cir. ___ _____________ _______ 1991) ("[H]earsay, if no objection is raised, is admissible.") (citation omitted); United States v. Newton, ______________ ______ 891 F.2d 944, 947-48 (1st Cir. 1989). Nor was defendant's failure to object surprising, since the testimony was elicited by the defense, not the prosecution, and it was _______ elicited purposefully, for its supposed impeachment value. ____________ We add that, in any event, given the strength of the case against Pineda, any error on this matter would be harmless. Third, defendant argues that the district court should have granted his post-verdict motion, under Fed. R. Crim. P. 33, for a new trial. He based that motion on the late discovery of two documents: (1) a Honduran birth certificate in the name of Sergio Pineda, age 15, and (2) a recently-issued Honduran ID card in the name of Francisco Javier Pineda, age 19, containing a photograph of a person other than the defendant. These two documents, in defendant's view, showed that he was not Francisco Javier -5- 5 Pineda, but Francisco Javier's 15-year-old younger brother Sergio, and thus he should have been tried as a juvenile. The district court concluded, however, that the documents did not show that the defendant was Sergio and that "the defendant in front of me is Francisco Javier Pineda-Paz." The only thing connecting the "Sergio" birth certificate to the defendant, or connecting the "Francisco Javier" ID to someone other than the defendant, the court explained, was the defendant's testimony to that effect. (On the photo ID connection, the Government had explained to the court that it would have been easy for some Honduran friend of the defendant to take the defendant's real birth certificate and use it to get a "Francisco Javier" ID with the friend's photograph on it.) And, on issues relating to "identification" and "age," the court found, the defendant "no longer has any credibility at all." The court pointed out: [T]he defendant first identified himself as Francisco Javier Pineda-Paz, age 19. Sometime thereafter, in connection with his custody, he announced that was age 15, . . . [a claim for which] a forged birth certificate was provided. Thereafter he withdrew that claim, and by the time of trial, testified . . . under oath that he was Francisco Javier Pineda-Paz, and that he was age 19, and testified that he had lied when -6- 6 he had earlier said that he was 15. And now when sentencing is imminent, the defendant again come forward challenging his age and this for the first time, challenges his identity and claims to be Sergio . . . , who previously had been identified as one of his brothers. On the basis of all this evidence, the district court's conclusion that defendant's new documentary evidence (and the testimony underlying it) was not credible is adequately supportable. See Veillette v. United States, 778 ___ _________ _____________ F.2d 899, 902 (1st Cir. 1985) (trial judge's findings of fact are set aside only if clearly erroneous), cert. denied, _____ ______ 476 U.S. 1115 (1986). The district court's decision not to grant a new trial is therefore lawful. See United States v. ___ _____________ Wright, 625 F.2d 1017, 1019 (1st Cir. 1980) (a new trial ______ motion is granted only if, among other things, the new evidence "will probably" lead to a different outcome). Fourth, Pineda argues that the district court should not have increased his sentence (to 121 months instead of the 120 months the statute mandatorily imposes, a one month difference) for an "obstruction of justice." Pineda's presentation of a forged birth certificate to the magistrate prior to trial (purportedly showing he was a minor) and his attempt, based on the forgery, to have the indictment dismissed, however, provide a sufficient legal -7- 7 basis for the increase. See U.S.S.G 3C1.1 application ___ note 3(c) ("[T]his enhancement applies [to] producing a false document during an official investigation or judicial proceeding.") (ellipses omitted); id. application note 3(f) __ (same for "providing materially false information to a judge or magistrate"); see also United States v. Biyaga, 9 F.3d ___ ____ ______________ ______ 204 (1st Cir. 1993). Appellant's remaining claims are without merit. For the reasons stated, the judgment of the district court is Affirmed. _________ -8- 8